1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  JUSTIN EUGENE RICE,                    Case No.  1:18-cv-00111-JLT-JDP (HC)

12              Petitioner,                FINDINGS AND RECOMMENDATIONS
                                           THAT THE AMENDED PETITION FOR
13      v.                                 WRIT OF HABEAS CORPUS BE DENIED

14  DANIEL PARAMO,                         OBJECTIONS DUE IN FOURTEEN DAYS

15              Respondent.                ECF No. 32

16

17      Petitioner Justin Eugene Rice, a state prisoner represented by counsel, seeks a writ of

18  habeas corpus under 28 U.S.C. § 2254.  He maintains, *inter alia*, that his trial counsel was

19  constitutionally ineffective because that attorney made a split-second decision to point out to the

20  court an issue with the verdict forms: the jury had, in violation of the court's instructions, failed to

21  indicate whether it was finding petitioner guilty of the most serious charges against him—three

22  counts of second degree murder.  Advised of the error, the court sent the jury back to deliberate

23  further, after which it convicted petitioner of these counts.  This court must consider whether the

24  state court could reasonably have concluded that counsel acted competently under the deferential

25  standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

26
27
28

                                1

# I.     Background

## A.     The Collision

While driving on the wrong side of the highway and under the influence of methamphetamine, petitioner struck a sedan head-on and at high speed.  ECF Nos. 37-1 at 12, 37-2 at 8.  Five people were riding in the sedan, and three of them—Elena Mendoza, Maria Erika Flores Rodriguez, and Estella Frias—were killed.  ECF Nos. 37-1 at 12, 37-2 at 9.  The driver of the sedan, Florida Zurata, and another passenger, Patricia Prendra Pedraza, survived.[1]  ECF No. 37-1 at 13.

## B.     Witnesses to the Collision

Witnesses observed petitioner's erratic, dangerous driving in the moments before the collision.  Thomas Blackmore, driving ahead of Zurata's sedan, saw petitioner's vehicle careen toward him on the wrong side of the freeway.  ECF No. 37-2 at 9.  He swerved off the road to avoid a collision and then, hearing what he thought was an explosion, turned to see Zurata's sedan lying on its side in the middle of the road.  *Id.* at 10.

Ramona Rodriguez was also traveling northbound—the same direction as Blackmore and Zurata.  ECF Nos. 37-1 at 13, 37-2 at 10.  She saw petitioner's vehicle headed the wrong way down the freeway, saw Blackmore's vehicle swerve to escape collision, and then saw petitioner's vehicle strike Zurata's sedan.  ECF Nos. 37-1 at 13-14, 37-2 at 10-11.  After stopping her vehicle, Rodriguez saw petitioner crawl from his truck.  ECF No. 37-2 at 11.  He appeared uninjured, and she approached and asked if he was ok.  *Id.*  Although petitioner said that he was, he appeared to have no understanding, at least initially, of the gravity of the collision that he had caused.  *Id.*

Ingrid Olivas was driving behind petitioner's vehicle.  ECF Nos. 37-1 at 15, 37-2 at 11.  She saw petitioner hit a guardrail several times and drive on without braking, as if nothing were amiss.  ECF Nos. 37-1 at 15, 37-2 at 11.  Alarmed, she called 911 to warn of an imminent

---

[1] Appellant's opening brief on appeal erroneously lists Zurata's name as "Zapata."  ECF No. 37-1 at 12.  Respondent's opening brief and the opinion of the state court confirm the correct spelling, however.

2

1   accident.  ECF No. 37-2 at 11.  She then watched as the truck veered into oncoming traffic and,

2   eventually, saw it strike Zurata's sedan.  ECF Nos. 37-1 at 15, 37-2 at 11.

3   **C.      Law Enforcement and Medical Personnel**

4   A paramedic, William Hartley, was the first emergency responder on the scene.  ECF No.

5   37-2 at 12.  When he arrived, two of the passengers in Zurata's sedan were already dead.  *Id.*  The

6   third was near death and passed away before she could be taken to a hospital.  *Id.*

7   Danielle Phillipson, a former emergency medical technician, also stopped to help.  *Id.*

8   After seeing petitioner climb from his crashed vehicle, Phillipson asked him a series of questions

9   intended to gauge his mental state.  *Id.*  Although petitioner answered the questions correctly,

10   Phillipson thought his demeanor was strange.  *Id.*  He spoke slowly and had a difficult time

11   making eye contact.  *Id.*  She testified that he did not seem especially concerned about the people

12   in the sedan and that, in light of the circumstances, his pulse seemed oddly slow.  *Id.*

13   Lance Hoffrage, a paramedic field supervisor, also came to render aid.  Hoffrage noted

14   that petitioner was able to obey commands and answer questions, but that he was distracted and

15   anxious.  ECF Nos. 37-1 at 17, 37-2 at 12.  Like Phillipson, Hoffrage testified that petitioner did

16   not seem particularly concerned about the victims in the other car and, instead, was focused on

17   certain of his personal belongings that were strewn across the road.  *Id.*  Hoffrage accompanied

18   petitioner to the hospital in an ambulance.  ECF No. 37-2 at 13.  As a paramedic, he had often

19   dealt with methamphetamine users, and he suspected that petitioner was under the drug's

20   influence.  *Id.*

21   Officer Peter Grotto was the responding member of the California Highway Patrol

22   ("CHP").  ECF Nos. 37-1 at 17, 37-2 at 13.  Grotto noticed that petitioner's eyes were constricted

23   and that he appeared unusually calm.  ECF No. 37-2 at 13.  At trial, over defense objection,

24   Grotto testified that petitioner's demeanor indicated that he was under the influence of a

25   stimulant.  ECF No. 37-1 at 17.

26   **D.      Witnesses at the Hospital**

27   Two CHP officers—Miller and McKown—were sent to the hospital to prevent petitioner

28   from leaving before the investigating officer arrived.  Miller testified that, when he arrived,

3

1    petitioner was in the emergency room area, asking a nurse in hurried tones to complete the

2    necessary paperwork so that he could leave.  ECF Nos. 37-1 at 21-22, 37-2 at 13.  Miller told

3    petitioner that he could not leave until the investigating officer arrived.  ECF Nos. 37-1 at 21-22,

4    37-2 at 13.  Ignoring Miller, petitioner tried to walk past the officer to the door, relenting only

5    when Miller blocked his path.  ECF Nos. 37-1 at 22, 37-2 at 13-14.

6         McKown arrived shortly thereafter and, together with Miller, convinced petitioner to sit

7    down.  ECF No. 37-2 at 14.  When the officers tried to make small talk with petitioner, he made

8    outlandish statements, referring to himself as "Michael the Archangel" and claiming that he was

9    on a divine mission in a parallel universe.  ECF Nos. 37-1 at 22, 37-2 at 14.  Petitioner's behavior

10   became increasingly erratic, and the officers eventually were forced to restrain him.  ECF Nos.

11   37-1 at 22, 37-2 at 14-15.

12        **E.     At the Madera CHP Office**

13        At the Madera CHP office, petitioner admitted to officer Grotto that he had taken three

14   hits of methamphetamine the day before the collision.  ECF Nos. 37-1 at 24, 37-2 at 18.

15   Petitioner also told Grotto that he did not know that he had hit another car.  *Id.*

16        Officer Van Ornam, a certified Drug Recognition Evaluator, evaluated petitioner at the

17   CHP office.  Ornam noted that petitioner's speech was slow and rambling, and his face flushed

18   and red.  ECF Nos. 37-1 at 23, 37-2 at 17.  Ornam concluded, after performing a series of tests,

19   that petitioner was under the influence of both methamphetamine and marijuana and would have

20   been unable to operate a vehicle safely at the time of the crash.  *Id.*

21        **F.     Other Relevant Witnesses**

22        Two and a half hours prior to the collision, Rodney Pearl and his co-worker Joey Otten

23   were driving near the town of Oakhurst.  ECF Nos. 37-1 at 16, 37-2 at 15.  At an intersection, the

24   pair noticed that traffic was blocked by debris on the road.  *Id.*  Pearl stopped the car and Otten

25   moved the debris.  *Id.*  The two men began to drive on, but noticed a pickup truck backing up

26   against traffic toward the debris.  *Id.*  After the driver of the truck, later identified as petitioner,

27   caught sight of Pearl and Otten, he began following them, driving recklessly and honking.  ECF

28   No. 37-2 at 15.  Pearl pulled over and petitioner angrily confronted the two men, accusing them

4

of having stolen his possessions. *Id.* Petitioner demanded that they let him inspect Pearl's truck for his belongings, but Pearl refused. *Id.* Eventually, petitioner was persuaded to drive back to look for his belongings on the road. ECF Nos. 37-1 at 16, 37-2 at 15-16.

### G.     Experts at Trial

The prosecution presented the testimony of Nadina Giorgi, a state department criminalist with expertise in both blood analysis and the effects of methamphetamine on a person's ability to drive safely. ECF Nos. 37-1 at 18, 37-2 at 17. Giorgi testified that the amount of methamphetamine in petitioner's blood precluded safe driving. ECF Nos. 37-1 at 18-19, 37-2 at 17.

Officer Grotto testified as an expert in accident investigations and opined that, based on his encounters with petitioner at the crash site and at the CHP office, petitioner had been under the influence of both methamphetamine and marijuana at the time of the collision. ECF Nos. 37-1 at 24, 37-2 at 18-19.

John Koltter, a CHP officer and member of the Multi-Disciplinary Accident Investigation Team, testified, based on data from a Sensing Diagnostic Module, that petitioner had been driving at about 73.5 miles per hour at the time of the collision and that there was no evidence that he applied the brakes before striking the sedan. ECF Nos. 37-1 at 21, 37-2 at 19. Koltter opined that, at the time of the collision, petitioner had been driving the vehicle, rather than asleep at the wheel. *Id.*

### H.     Jury Verdicts

In 2013, a jury in Madera County Superior Court convicted petitioner of three counts of second degree murder, three counts of gross vehicular manslaughter while intoxicated, one count of driving under the influence of alcohol or a drug and causing great bodily injury, and two counts of resisting an executive officer by the use of force or violence. ECF No. 32 at 9. He was sentenced to 90 years to life plus a six-year determinate term in prison. *Id.*

During their deliberations, the jury asked: "In the case of a greater or lesser charge—do we have to acquit on the greater charge before we can move on to the lesser? (We disagree on the greater but all agree on the lesser)." CT 1:252. The court consulted with both the prosecution

and the defense attorney before submitting a response to the jury, directing the jurors' attention to two portions of the jury instructions stating that the jury must reach a verdict on the greater charge before rendering a verdict on the lesser: CALCRIM Nos. 642 and 3517.[2]  RT 24:6904-07. The jurors were later dismissed for the day without reaching a verdict.

After a break, the jury returned and the foreperson informed the court that the jury had reached a verdict on all counts.  RT 26:7506.  After examining the verdict forms, the court pronounced them to be in proper form.  RT 26:7506.  The clerk then read the verdicts into the record as "verdicts lesser" on counts 1-3—finding petitioner guilty of the lesser-included offenses of involuntary manslaughter—and 8-9.  RT 26:7507-11.  The judge then asked the jury if these were indeed their verdicts, to which the "[j]urors collectively responded affirmatively."  RT 26:7512.  When the judge asked if either side wished to poll the jury, petitioner's trial counsel stated that he did not wish to have the jury polled but asked to approach.  RT 26:7512.  During the ensuing bench conference, which occurred off the record, petitioner's counsel informed the court that the verdict forms were incomplete on counts 1-3 and 8-9.  ECF No. 32-2 at 1.  Later, in a sworn declaration filed with petitioner's first amended petition, counsel clarified that his "goal was to ensure the not guilty verdicts on murder, deeming lesser convictions favorable, so that they could not be challenged or rendered invalid."  ECF No. 32-2 at 1.  While informing the court of the incomplete verdict forms, he further "advised the Judge that [petitioner] had to be found not guilty of the greater charge before the lesser charge convictions would be valid."  ECF No. 32-2

---

[2] CALCRIM 642 includes the following language regarding California's so-called acquittal-first rule: "You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of involuntary manslaughter only if all of you have found the defendant not guilty of second degree murder."  The instruction further states, "[i]f all of you cannot agree whether the defendant is guilty of second degree murder, inform me that you cannot reach an agreement and do not complete or sign any verdict forms [for that count]."

CALCRIM 3517 includes a generalized version of the language contained in CALCRIM 642.  The bench notes for CALCRIM 3517 advise that it should not be provided to a jury for murder or manslaughter charges, but rather the court should provide more specific instructions, including CALCRIM 642.

The jury followed the instructions of CALCRIM 642 by noting that jurors had not reached agreement on the greater charge.  In the trial court's response, the jury was not instructed about how to inform the trial court of a deadlock, nor were jurors asked whether they had deadlocked.

1    at 1.

2        After the bench conference, the judge informed the jury that the trial court could not

3 "accept the verdicts that have been read of the lesser offenses in Counts 1, 2, and 3 and Counts 8

4 and 9" until they "signed not guilty forms of the greater offenses." RT 26:7513. The judge then

5 stated, "what we're going to have to do is send you back so that you can determine what your

6 verdicts are on the greater offenses. We cannot accept the verdicts that have been read on the

7 lesser offenses unless and until the jury renders not guilty verdicts on the greater offenses." RT

8 26:7513-14. The judge sent the jury back "without any further instructions" and asked that the

9 jurors inform the court as soon as they were "ready," noting that the jurors could "bring back

10 whatever forms [they] have completed, if [they] determine to complete them."[3] RT 26:7514.

11 The judge thanked the jurors "for [their] patience" and apologized for not having caught the issue

12 earlier. RT 26:7514.

13        While the jury deliberated, petitioner's counsel moved for a mistrial, citing the possibility

14 that the jury might return a guilty verdict on the greater offenses even though the initial verdicts

15 had been read into the record. RT 26:7518. During argument regarding the motion for a mistrial,

16 which the trial court denied, the prosecutor noted that he had "commended counsel for catching

17 what [the prosecutor] did not catch." RT 26:7519. The prosecutor then stated that his "concern

18 was whether anything we did interfered with their deliberations. It's the People's contention that

19 we did not." RT 26:7519-20.

20        When the jury again returned to the courtroom, after informing the trial court that the

21 verdict forms were complete, the following occurred:

22          THE COURT: Ladies and gentlemen of the jury, with respect to

23          the verdicts on the verdict forms on Counts 1, 2, and 3, which were

---

24        [3] This was the second time that the jury had been instructed on this point. Later, in

25 support of a motion for a new trial, which the trial court denied, trial counsel supplied affidavits
from two jurors, focusing on the jury instructions. The affidavits stated that the final instructions

26 confused the jurors, who did not understand that a deadlock was an acceptable outcome. *See* CT
2:442-45. As such, while the trial court properly instructed the jury, the fact that the jury was

27 never instructed verbally on how to inform the court of deadlock might explain the initially
incomplete verdict forms.

28

previously submitted to the Court and which the clerk read, finding
the defendant guilty of a lesser offense, do those verdicts that were
earlier submitted accurately represent the verdict of the jury?  The
earlier ones?

FOREPERSON:  Not since we have deliberated again.

THE COURT:  All right.  So, the question is then, do these earlier
submitted verdicts on Counts 1, 2, and 3 accurately reflect the
verdict of the jury?

FOREPERSON:  No.

RT 26:7522.  The trial court then polled the individual jurors, asking whether the verdict forms

earlier submitted were their "true and correct verdicts," to which each responded, "No."

RT 26:7523-24.  Accordingly, the trial court deemed the earlier verdicts null and void.  RT

26:7524.

After additional deliberation, the jury found petitioner guilty of second degree murder with

respect to each victim.  RT 26:7525-26.

## II.    Discussion

A federal court may grant habeas relief when a petitioner shows that his custody violates

federal law.  *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

(2000).  Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition.  *See Harrington v. Richter*,

562 U.S. 86, 97 (2011).  To decide a § 2254 petition, a federal court examines the decision of the

last state court that issued a reasoned opinion on petitioner's habeas claims.  *See Wilson v. Sellers*,

138 S. Ct. 1188, 1192 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) ("Because,

here, neither the court of appeal nor the California Supreme Court issued a reasoned opinion on

the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*, 621 F.3d

970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was last

reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003) ("Because

the California Supreme Court denied review of Gill's habeas petition without comment, we look

8

1    through the unexplained California Supreme Court decision to the last reasoned decision . . . as

2    the basis for the state court's judgment.") (internal quotations omitted).

3         Under AEDPA, a petitioner can obtain relief on federal habeas claims that have been

4    "adjudicated on the merits in state court proceedings" only if the state court's adjudication

5    resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly

6    established Federal law, as determined by the Supreme Court of the United States" or (2) "based

7    on an unreasonable determination of the facts in light of the evidence presented in the State court

8    proceeding."  28 U.S.C. § 2254(d).

9         **A.    Ineffective Assistance of Counsel**

10        Petitioner claims that he was denied effective assistance of counsel when his lawyer

11   informed the trial court of the incomplete verdict forms on counts 1-3, ultimately leading, he

12   alleges, to his convictions for second degree murder rather than for the lesser offense of

13   involuntary manslaughter.  ECF No. 32 at 25.  Petitioner asks that the court vacate the judgments

14   of conviction for second degree murder and order his release from the custody of the California

15   Department of Corrections and Rehabilitation.  *Id.* at 26.

16        Petitioner raised his claim of ineffective assistance of counsel through direct appeal in

17   California's courts.  The court of appeal denied his claim for relief, reasoning that the claim

18   would be better raised in a petition for a writ of habeas corpus, *see Rice*, 2016 WL 4249731 at

19   *13, and the California Supreme Court summarily denied relief, ECF No. 15-3.  By presenting his

20   claims on direct appeal to the California Supreme Court, petitioner properly exhausted his claims.

21   *See* 28 U.S.C. § 2254(c); *Turner v. Compoy*, 827 F.2d 526, 529-30 (9th Cir. 1987) (holding that

22   even though California Supreme Court had stated a preference for resolving an ineffective

23   assistance of counsel claim in habeas proceedings, petitioner exhausted state remedies by raising

24   the claim on direct appeal); *Chambers v. McDaniel*, 549 F.3d 1191, 1197 (9th Cir. 2008)

25   ("[U]nless a court expressly (not implicitly) states that it is relying upon a procedural bar, we

26   must construe an ambiguous state court response as acting on the merits of a claim, if such a

27   construction is plausible.").

28        Petitioner's *Strickland* claim, while exhausted, includes "no reasoned state court decision

1   to assess." *See Reynoso v. Giurbino*, 462 F.3d 1099, 1119 (9th Cir. 2006). "In this situation, the

2   district court must conduct an independent review of the record; if after such review, it concludes

3   that controlling Supreme Court law, unless applied in an unreasonable manner, would preclude

4   the result reached by the state courts, it must grant relief to the petitioner." *Id.*; *see Cook v.*

5   *Kernan*, 948 F.3d 952, 966 (9th Cir. 2020) ("Despite the state court's lack of explanation for its

6   denial of relief, our review is still subject to AEDPA."); *Delgado v. Lewis*, 223 F.3d 976, 982 (9th

7   Cir. 2000) ("Federal habeas review is not *de novo* when the state court does not supply reasoning

8   for its decision, but an independent review of the record is required."). Accordingly, petitioner's

9   request for relief may be granted only if there is no reasonable basis on which the state courts

10  could have concluded that petitioner received constitutionally effective assistance of counsel.

11       "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth

12  Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the

13  'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland v.*

14  *Washington*, 466 U.S. 668, 685 (1984) (quoting *Adams v. United States ex rel. McCann*, 317 U.S.

15  269, 275 (1942)). Under *Strickland*, petitioner must establish two components to succeed on a

16  claim of ineffective assistance of counsel: (1) unreasonably deficient performance, meaning that

17  trial counsel's performance "fell below an objective standard of reasonableness"; and

18  (2) prejudice, meaning that "there is a reasonable probability that, but for counsel's

19  unprofessional errors, the result of the proceeding would have been different." *Strickland* at 688.

20  This standard is not to be applied mechanically, however. *Strickland* itself cautions:

> Most important, in adjudicating a claim of actual ineffectiveness of
> counsel, a court should keep in mind that the principles we have
> stated do not establish mechanical rules. Although those principles
> should guide the process of decision, *the ultimate focus of inquiry*
> *must be on the fundamental fairness of the proceeding whose result*
> *is being challenged*. In every case the court should be concerned
> with whether, despite the strong presumption of reliability, the
> result of the particular proceeding is unreliable because of a
> breakdown in the adversarial process that our system counts on to
> produce just results.

27  *Id.* at 696 (emphasis added); *see Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The

28  essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the

1   adversarial balance between defense and prosecution that the trial was rendered unfair and the

2   verdict rendered suspect.").

3       Since the Supreme Court has not specifically addressed the circumstances at issue, this

4   court is left with the general standard and must ask whether a reasonable application of *Strickland*

5   could preclude petitioner's claim.  *See Richter*, 562 U.S. at 101 ("A state court's determination

6   that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

7   disagree' on the correctness of the state court's decision."); *Lockyer v. Andrade*, 538 U.S. 63, 75

8   (2003) (holding that relief under AEDPA is warranted only where a state court's determination is

9   "objectively unreasonable," and not merely "incorrect or erroneous").  The question of whether

10  the state court's application of *Strickland* was reasonable is distinct from whether defense counsel

11  ran afoul of the *Strickland* standard.  *Harrington v. Richter,* 562 U.S. 86, 105 (2011).  Only the

12  first question is pertinent on federal habeas review; otherwise, this court would be engaging in the

13  kind of direct, undeferential review that AEDPA precludes.  *Id.* ("For purposes of § 2254(d)(1),

14  an unreasonable application of federal law is different from an incorrect application of federal

15  law.  A state court must be granted a deference and latitude that are not in operation when the

16  case involves review under the *Strickland* standard itself.").[4]  And so I am guided by the question

17  of whether a fairminded jurist could reasonably have found that petitioner's trial was not

18  fundamentally unfair.

19

20      [4] In his answer, respondent argues that petitioner's claim is barred by the non-retroactivity
    rule in *Teague v. Lane*, 489 U.S. 288 (1989), because his claim to relief is staked on the creation

21  of a new rule, namely that counsel was constitutionally required to stay silent and facilitate the
    trial court making an error in his client's favor.  ECF No. 36 at 31.  In *Teague*, the Supreme Court

22  held that new rules should not apply to cases on collateral review, outside of two narrow
    exceptions.  *Teague*, 489 U.S. at 307.  The first exception is for rules that "place certain kinds of

23  primary, private individual conduct beyond the power of the criminal law-making authority to
    proscribe."  *Id.* (internal quotation marks omitted).  The second exception is for any rule that

24  "requires the observance of those procedures that . . . are implicit in the concept of ordered
    liberty."  *Id.* (internal quotation marks and citations omitted).

25      I am not convinced that petitioner's claim to relief is predicated on the creation of a new

26  rule.  Although the facts here are unique, *Strickland* is, in my view, the proper lens through which
    to view them.  The creation of a new rule is not at issue here.  *See Chaidez v. United States*, 568

27  U.S. 342, 348 (2013) ("[W]e have granted relief under Strickland in diverse contexts without ever
    suggesting that doing so required a new rule.").

28

1    The petition focuses on whether trial counsel erred under state law.  ECF No. 32 at 44-49.

2    Petitioner argues the obvious—that involuntary manslaughter verdicts were firmly in hand until

3    counsel questioned the sufficiency of the initial verdicts, causing them to slip away.  *Id.* at 49-51.

4    In assessing petitioner's claim, this court must consider whether a state court could

5    reasonably have found counsel's decision to inform the court of the problem with the verdict

6    forms to have fallen within prevailing professional norms.  Consideration of those norms

7    "includes a context-dependent consideration of the challenged conduct as seen from counsel's

8    perspective at the time."  *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (internal quotation marks

9    and citations omitted); *see Strickland*, 466 U.S. at 689 ("A fair assessment of attorney

10   performance requires that every effort be made to eliminate the distorting effects of hindsight, to

11   reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

12   counsel's perspective at the time.").

13   As an initial matter, a state court might reasonably have taken into account counsel's

14   responsibilities as an officer of the court.  The Court of Appeals has recognized that "[a]n

15   attorney does not simply act as an advocate for his client; he is also an officer of the court . . . . As

16   such, an attorney has a duty of good faith and candor in dealing with the judiciary."  *United States*

17   *v. Associated Convalescent Enters., Inc.*, 766 F.2d 1342, 1346 (9th Cir. 1985).  Petitioner's trial

18   counsel appears to have believed that this duty aligned with his obligations to his client.  In his

19   declaration, he stated that he noticed that verdict forms were deficient and advised the court of the

20   error to "ensure the not guilty verdicts on murder . . . so that they could not be challenged or

21   rendered invalid."  ECF No. 32-2 at 2.  Counsel noted that "[s]ince the judge indicated the

22   verdicts were in order and the jury had been repeatedly told that to convict [petitioner] of a lesser

23   count, he would have to be acquitted of the greater counts, [he] felt it was their desire to acquit

24   [petitioner] of murder."  *Id.*  The act unquestionably backfired, but that does not automatically

25   render it outside of professional norms.

26   Counsel had to make a split-second decision: any delay in his review of the verdict forms

27   would have called the court or the prosecutor's attention to the very error that he had found, thus

28   taking the decision out of his hands.  Petitioner argues that counsel's duties as an officer of the

1    court did not require him to point out the error, and that under state law the improperly completed

2    verdict forms would have yielded a valid acquittal on the second degree murder charges.  ECF

3    No. 32 at 46.  But a fairminded jurist might have concluded that few competent defense attorneys

4    would have had such knowledge at their fingertips.  *See Richter*, 562 U.S. at 110 ("[A]n attorney

5    may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for

6    what appear to be remote possibilities.").  Petitioner's attorney may have made the wrong call,

7    but "[t]he question is whether an attorney's representation amounted to incompetence under

8    prevailing professional norms, not whether it deviated from best practices or most common

9    custom."  *Id.* at 105 (internal quotation marks omitted).

10        A fairminded jurist could reasonably have concluded that trial counsel's error of law and

11    tactics, assuming it was an error, did not disrupt "the fundamental fairness of the proceeding."

12    466 U.S. at 671; *see also Roe v. Flores-Ortega*, 528 U.S. 470, 482 (2000) ("[T]he right to the

13    effective assistance of counsel is recognized not for its own sake, but because of the effect it has

14    on the ability of the accused to receive a fair trial . . . .").  Here, the conduct complained of

15    occurred at the trial's end, after all relevant evidence and argument had already been put to the

16    jury.  Trial counsel's mistake resulted in additional deliberation on the part of the jury, but the

17    substantive posture of the case remained unchanged, and no new evidence or argument was

18    presented.  The role of the jury was not usurped; the jury was free to return a more favorable

19    verdict, finding petitioner not guilty of second degree murder.

20        In his traverse, petitioner argues that the outcome of the trial was unreliable because "the

21    jury in this case arrived at a verdict, but when ordered back by the trial court to continue

22    deliberations, it altered its conclusion."  ECF No. 40 at 16-17.  Even if this is an accurate

23    characterization of events, it does not explain why the final verdict must be viewed as unreliable.[5]

24    

25        [5] Cases in which counsel's actions have been found to have rendered a verdict unreliable
      are rare, and the failures of representation in those rare cases tend to be egregious.  Consider

26    *Sanders v. Ratelle*, in which, prior to conviction, the defendant's brother confessed that he had
      committed the relevant murder.  21 F.3d 1446, 1456 (9th Cir. 1994).  The Ninth Circuit

27    overturned the defendant's conviction where his counsel failed to interview this key and
      potentially exculpatory witness.  *Id.* at 1456, 1461-62.  Similarly, in *Riley v. Payne*, counsel

28    rendered ineffective assistance by failing to interview the lone witness who could have supported

13

1    There is no right to an acquittal; a verdict's reliability does not rest on its favorability to the

2    accused.  *See Fretwell v. Lockhart*, 506 U.S. 364, 369 (1993) ("Thus, an analysis focusing solely

3    on mere outcome determination, without attention to whether the result of the proceeding was

4    fundamentally unfair or unreliable, is defective.").[6]  Indeed, a state court might reasonably have

5    concluded, applying *Strickland*, that petitioner could not have been prejudiced by his counsel's

6    actions, since the impact of those actions was simply to force the jury to abide by the court's

7    instructions.  Perhaps causing the jury to discharge its duty properly should not be viewed as

8    unfair, even if the result is adverse to a criminal defendant.

9         At the end of the day, petitioner is arguing that he is entitled to the benefit of the trial

10   court's error in reviewing the verdict forms.  Applying Supreme Court precedent, a state court

11   might reasonably have determined that petitioner was merely denied "a windfall to which the law

12   does not entitle him."  *Fretwell*, 506 U.S. at 370.  His attorney caught a mistake that nobody else

13   had caught, at least up to that point.[7]  Perhaps he should have kept quiet about it, but such a

14   miscalculation could reasonably be held not to have rendered him constitutionally deficient.

15        **B.    Sufficiency of the Evidence**

16        Petitioner claims that there was insufficient evidence to convict him of second degree

17   murder.  ECF No. 32 at 34.  The court of appeal denied petitioner's claim on the merits, holding

18   that the evidence of petitioner's drug-induced impairment and reckless driving was sufficient to

19   _____

20   the defendant's account that he shot the victim in self-defense.  352 F.3d 1313, 1321-25 (9th Cir.
     2003).  In *Noguera v. Davis*, the defendant was found guilty and faced a death sentence.  5 F.4th

21   1020, 1041 (9th Cir. 2021).  Counsel rendered ineffective assistance during the penalty phase
     where, instead of investigating strong evidence of the defendant's dysfunctional family history

22   and possibly damaged mental state, the attorneys relied exclusively on witnesses "who could say
     good things about him."  *Id.*  In these cases, counsel's failings infected the fundamentals of the

23   adversarial process; counsel failed to pursue lines of inquiry and argument whose basic
     importance would have been obvious to many laymen, to say nothing of reasonable defense

24   counsel.

25        [6] In *Williams*, the Supreme Court explained that *Fretwell* does not "justify a departure
     from a straightforward application of *Strickland* when the ineffectiveness of counsel does deprive

26   the defendant of a substantive or procedural right to which the law entitles him."  529 U.S. at 393.

27        [7] As respondent argues in his answer, a reasonable jurist might have concluded that the
     trial judge, prosecutor, or clerk could have been expected discover the deficiency in the verdict

28   forms before they were finally recorded, and thus that counsel's alleged error would likely have
     had no impact on the trial's outcome.  ECF No. 36 at 35.

1  support his conviction.  I review the court's denial—the last reasoned opinion—under the

2  deferential standard of § 2254.

3  Under the Fourteenth Amendment's Due Process Clause, no person can suffer a criminal

4  conviction "except upon sufficient proof—defined as evidence necessary to convince a trier of

5  fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v.*

6  *Virginia*, 443 U.S. 307, 316 (1979).  A habeas petitioner challenging the sufficiency of evidence

7  under *Jackson* must overcome "two layers of judicial deference."  *See Coleman v. Johnson*, 566

8  U.S. 650, 651 (2012).  On direct appeal, the appellate court decides "whether, after viewing the

9  evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

10  the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  On

11  habeas review, AEDPA's deferential standard applies, and a federal court may "overturn a state

12  court decision rejecting a sufficiency of the evidence challenge . . . only if the state court decision

13  was 'objectively unreasonable'" under AEDPA.  *Coleman*, 566 U.S. at 651 (quoting *Cavazos v.*

14  *Smith*, 565 U.S. 1, 2 (2011)).  The "only question under *Jackson*" is whether the jury's finding

15  was "so insupportable as to fall below the threshold of bare rationality." *Id.* at 656.  It "is the

16  responsibility of the jury—not the court—to decide what conclusions should be drawn from

17  evidence admitted at trial." *Cavazos*, 565 U.S. at 4.

18  Applying this deferential standard, I must uphold the state court's decision unless the

19  court was "objectively unreasonable" in finding sufficient evidence.  *Johnson*, 899 F.3d at

20  1056.  In California, "[m]urder is the unlawful killing of a human being . . . with malice

21  aforethought." Cal. Pen. Code § 187(a).  A fatal traffic collision can support a second degree

22  murder conviction if the defendant acted with implied malice, meaning the defendant performed

23  an act "with a high probability that it will result in death . . . with a wanton disregard for human

24  life." *See People v. Watson*, 30 Cal. 3d 290, 300-01 (1981).  Implied malice can be proven

25  through circumstantial evidence and "requires a defendant's awareness of engaging in conduct

26  that endangers the life of another—no more, and no less." *People v. Knoller*, 41 Cal. 4th 139,

27  143 (2007); *see People v. Superior Court (Costa)*, 183 Cal. App. 4th 690, 697 (2010).  Although

28  not required for a finding of implied malice, courts consider factors such as intoxication and

15

1    highly dangerous driving to be circumstantial evidence of implied malice.  *See People v.*

2    *Batchelor*, 229 Cal. App. 4th 1102, 1112-14 (2014).

3         Here, the jury heard evidence that petitioner was driving with abandon.  Witnesses

4    Zupata, Rodriguez, and Olivas testified that they saw petitioner drive into the northbound lane of

5    oncoming traffic, and Olivas also saw petitioner glance off the guardrail, prompting her to call the

6    police.  RT 10:2770-76; 11:3017-19; 11:3085-111.  Witness Blackmore watched petitioner speed

7    past five to seven cars; Blackmore had to swerve out of petitioner's way to avoid being hit.  RT

8    11:3051-67.  Two and a half hours before the collision, witnesses who encountered petitioner

9    feared that he was going to kill someone, based on his angry and erratic behavior.  RT 11:3128-

10   51.  An investigator and an expert both testified that petitioner was speeding, and an expert

11   testified that petitioner did not use his brakes before the collision.  RT 22:6311, 6330.

12        The jury also heard evidence that petitioner was impaired by drugs at the time of the

13   incident.  Methamphetamine, amphetamine, and marijuana were found in his blood after the

14   incident, and an expert testified that petitioner was too impaired to drive safely.  RT 13:3735-49;

15   15:4232, 4254, 4276.  And although a defense expert testified that petitioner was not suffering

16   from acute intoxication at the time of the collision, RT 16:4579-80, the jury heard evidence that

17   methamphetamine can impair a person for up to twelve hours and that the withdrawal effects of

18   the drug include sleepiness.  RT 13:3750-62.  Dr. Fullerton testified that the withdrawal effects

19   could lead petitioner to fall asleep, then wake, then fall asleep again.  RT 16:4532-60.  In

20   California, sleepiness induced by the withdrawal effects of methamphetamine usage can support a

21   finding that a driver was impaired.  *See People v. Jimenez*, 242 Cal. App. 4th 1337, 1356-57

22   (2015).

23        Considering this evidence, a "rational trier of fact could have found" implied

24   malice.  *Jackson*, 443 U.S. at 319.  Therefore, I cannot find that the court of appeal's rejection of

25   petitioner's insufficient evidence claim was "objectively unreasonable."  *Coleman*, 566 U.S. at

26   651.

27        It is RECOMMENDED that petitioner's first amended petition, ECF No. 32, be DENIED.

28   These findings and recommendations are submitted to the U.S. District Court judge

presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within fourteen days of the service of the findings and recommendations, the parties may file written objections to the findings and recommendations with the court and serve a copy on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C). The parties' failure to file objections within the specified time may result in the waiver of rights on appeal.  *See Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:  February 25, 2022

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE